IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNDERWOOD FINANCIAL, LTD. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:23-CV-00825-L |
| | § | |
| AMCO INSURANCE COMPANY, | § | |
| | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the court are the following motions filed on June 17, 2024: Defendant AMCO Insurance Company's Opposed Motion to Strike the Opinions and Testimony of Plaintiff's Retained Testifying Expert Scott Jetton (Doc. 35) ("Defendant's Motion to Strike"); Defendant AMCO Insurance Company's Motion for Summary Judgment (Doc. 38) ("Defendant's Motion for Summary Judgment"); and Plaintiff's Motion to Exclude Expert Testimony and Brief in Support (Doc. 42) ("Plaintiff's Motion to Exclude"). After careful consideration of the motions, responses, replies, appendixes, record, and applicable law, and for the reasons set forth herein, the court **denies** Defendants' Motion to Strike (Doc. 35); **denies** Defendant's Motion for Summary Judgment (Doc. 38); and **denies without prejudice** Plaintiff's Motion to Exclude (Doc. 42).

I.    **Factual and Procedural Background**

This is an insurance coverage dispute.[1] Plaintiff Underwood Financial, Ltd. ("Plaintiff" or "Underwood") owns and manages two commercial buildings—Building 200 and Building 300— at 635 W. Campbell Road in Richardson, Texas (the "Property"). AMCO Insurance Company,

---

[1] The court recounts the evidence in the light most favorable to Plaintiff, as the summary judgment nonmovant, and draws all reasonable inferences in its favor in accordance with the standard in Section II of this opinion.

part of the Nationwide family of companies ("Defendant" or "Nationwide"), insured the Property under Policy No. ACP CPAA 3029999522, effective from January 31, 2021, to January 31, 2022 (the "2021 Policy") and Policy No. ACP CPAA 3039999522, effective from January 31, 2022, to January 31, 2023 (the "2022 Policy"). *See* Doc. 40-1, Def.'s App. at 9-103 (2021 Policy); Doc. 40-1, Def.'s App. at 104-199 (2022 Policy).[2]  The 2021 Policy and the 2022 Policy both provide that Defendant will "pay for direct physical loss of or damage to Covered Property at [the Property] caused by or resulting from any Covered Cause of Loss." Doc. 40-1, Def.'s App. at 31, 124. Both policies define "Covered Causes of Loss" as "direct physical loss unless the loss is excluded or limited in this policy." Doc. 40-1, Def.'s App. at 67, 163. Both policies expressly exclude coverage for damage caused by or resulting from: "[w]ear and tear"; "[r]ust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself"; and "[s]ettling, cracking, shrinking or expansion[.]" Doc. 40-1, Def.'s App. at 69, 164.

### A.  The 2021 Hail Claim

Following a storm on April 23, 2021, Plaintiff's principal Courtney Underwood sent an e-mail to her insurance agent, stating:

> We've finally pulled together all of the HVAC unit information for the hail damage claim in Richardson for the storm on 4/23/2021 for 635 W Campbell Road Bldg 200 and 300. The roofers were out doing their final work up on the roof yesterday-there wasn't any hail damage to the roofs or awnings but the HVAC units in the attached word doc all have extremely damaged coils[.]

Doc. 40-1, Def.'s App. at 214.

Plaintiff made a claim under the 2021 Policy for hail damage, and Defendant assigned adjuster Mark Oxenberg to the claim. Doc. 40-1, Def.'s App. at 3, 201. Mr. Oxenberg retrieved a

---

[2] Citations to the record and briefs refer to the CM/ECF page numbers at the top of the page, rather than the parties' pagination at the bottom. "Def.'s App." refers to the "Appendix to Defendant AMCO Insurance Company's Brief in Support of its Motion for Summary Judgment." "Pl.'s Resp. App." refers to the "Appendix in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment."

**Memorandum Opinion and Order - Page 2**

CoreLogic Hail Verification Report, which confirmed a hailstorm on April 23, 2021, the reported date of loss. Doc. 40-1, Def.'s App. at 3, 217. Defendant retained HVAC Investigators ("HVACi"), who inspected the Property and produced a report concluding that hail from the storm damaged the HVAC units. Doc. 40-1, Def.'s App. at 3-4, 207, 222-224. Ultimately, Defendant issued payment for the full amount of the agreed scope of damages less the 2021 Policy's $10,000 wind/hail deductible. Doc. 40-1, Def.'s App. at 4, 203-204, 253, 259.

### B. The 2022 Wind and Water Claim

On June 2, 2022, a tenant in Building 300 reported a roof leak and flooding following a June 1, 2022 storm with high winds and rain. Doc. 52-4, Pl.'s Resp. App. at 6. Plaintiff then filed a claim for "water damage to restaurant from roof leak" with a reported loss date of June 1, 2022. Doc. 40-1, Def.'s App. at 4, 287-289. On June 6, 2022, David Kaapro, the adjuster, contacted Ms. Underwood who reported that wind damaged the tar and gravel roof which had not leaked before, and he explained the inspection that would be conducted by SeekNow. Doc. 40-1, Def.'s App. at 5. Thereafter, Mr. Kaapro contacted Ms. Underwood and her agent, and he advised them of the 2022 Policy's $40,632 wind/hail deductible for Building 300. Doc. 40-1, Def.'s App. at 4-5, 286, 292.

Prior to any inspection, on June 8, 2022, Mr. Kaapro had a conversation with Ms. Underwood informing her that "interior damage to the [tenant's] suite would be covered under the tenant's policy," and that "while he agreed that there was damage to the roof, [he] was confident that it would be less than the deductible, that he was confident the roof could be repaired and Nationwide . . . [and he] didn't believe the roof would need to be replaced." Doc. 52, Pl.'s Resp. App. at 34 (Underwood Dep. Tr. 70:15–71:8). On June 9, 2022, based on Mr. Kaapro's statements, Ms. Underwood advised Defendant to close the claim. Doc. 40-1, Def.'s App. at 4-5, 279.

That same day, the tenant in Building 300 filed a claim with her insurance company (NGIC), which engaged SeekNow to inspect the building's roof and claimed interior damage. Doc. 40-1, Def.'s App. at 5, 325-327. SeekNow reported no wind or hail damage to the roof and attributed the interior damage to a roof leak resulting from clogged drains. Doc. 40-1, Def.'s App. at 5, 313-315. Following continued disagreements regarding whether the 2022 Policy covered the damage, NGIC engaged an engineer—Tommy Tolson of Tolson Engineering Services—to evaluate the roof and interior leaks. Doc. 40-1, Def.'s App. at 5-6, 301-303. Mr. Tolson concluded there was no wind damage to the roof following the June 2022 storm and that water entered through the sealant defects at the screen wall pitch pans and through the longitudinal cracks at the curb flashing. Doc. 40-1, Def.'s App. at 6, 392. Based on Mr. Tolson's findings, NGIC denied the tenant's claim on July 6, 2022. Doc. 40-1, Def.'s App. at 5-6, 294.

Following denial of the tenant's claim, Plaintiff asked Defendant to reopen the 2022 Wind and Water Claim and to retain an engineer to inspect the roof. Doc. 40-1, Def.'s App. at 6, 456-457. Mr. Kaapro declined to send an engineer for further inspection based on his review of Mr. Tolson's report. Doc. 40-1, Def.'s App. at 6, 458. On July 12, 2022, Mr. Kaapro noted in the file that the 2022 Policy contains exclusions and limitations for loss caused by wear and tear, deterioration, and rain leaks resulting from non-covered causes of loss, and he prepared a denial letter for his manager's review. Doc. 40-1, Def.'s App. at 6, 458. The denial letter advised that Defendant had determined the loss at Building 300 was caused by wind-driven rain, ponding of rain water, inadequate drainage, wear and tear, and deterioration of the roofing and sealant at pitch pans, and that no wind damage to the roof or exterior walls causing water to enter was present to allow coverage for interior water damage from rain. Doc. 40-1, Def.'s App. at 460.

**Memorandum Opinion and Order - Page 4**

### C. Plaintiff's Retention of Roofing Expert

Following Defendant's denial of the 2022 Wind and Water Claim, Plaintiff hired roofing consultant Scott Jetton of Ranger Technical Services to inspect the Property and review Mr. Tolson's report and the HVACi report. Doc. 52-4, Pl.'s Resp. App. at 214. Following an inspection on August 2, 2022, Mr. Jetton prepared an inspection report (the "Pre-Litigation Inspection Report"). Doc. 52-4, Pl.'s Resp. App. at 213-247. With respect to wind damage from the June 2022 windstorm leading to water intrusion, Mr. Jetton observed that "[t]he roofing system is separated 'split' at several locations along the perimeter of the roof, consistent with damage typically observed with high wind events." Doc. 52-4, Pl.'s Resp. App. at 216. He noted that "the sort of horizontal splits and cracks in the BUR flashing" is "a typical condition caused by wind uplift," and that the "windblown debris found in the separation 'horizontally split' between the edge metal flashing and the BUR" suggested wind uplift was involved. Doc. 52-4, Pl.'s Resp. App. at 216. Mr. Jetton summarized the evidence of wind damage: "There is a broken vent pipe, a leaning vent pipe . . . separations between the cap flashings and BUR, displaced materials on the roof surface on the roof system, and missing clay tiles . . . and displaced bird deterrents on the screen wall." Doc. 52-4, Pl.'s Resp. App. at 216-217.

With respect to hail, Mr. Jetton observed:

> Dents consistent with hail stone impacts were observed on all exposed condenser coils and on all exposed roof metal . . . There are impact marks on the roof surface consistent with hail stone impacts throughout the roof. . . . Review of both the [Nationwide-commissioned 2021] HAVCi and [July 2022] Tolson reports indicate damage consistent with hail stone impacts. . . . The roof cores obtained during the Ranger inspection revealed damage consistent with hail stone strikes.

Doc. 52-4, Pl.'s Resp. App. at 215-216, 219.

**Memorandum Opinion and Order - Page 5**

### D. Plaintiff's Requests to Reopen Claims

On August 3, 2022, Mr. Kaapro received a letter of representation from Plaintiff's counsel with respect to both the 2022 Wind and Water Claim and the 2021 Hail Claim (expanded to include hail damage to the roof at the Property and not just to the HVAC equipment, as previously believed). Doc. 40-1, Def.'s App. at 6. On August 16, 2022, Plaintiff's counsel also sent Defendant a copy of the Pre-Litigation Inspection Report, Doc. 52-4, Pl.'s Resp. App. at 211-212.

On September 6, 2022, Mr. Oxenberg sent a letter to Plaintiff's counsel advising him that Defendant would investigate, subject to a reservation of rights, the alleged hail damage to the roof now being claimed with respect to the reopened 2021 Hail Claim. Doc. 40-1, Def.'s App. at 7. Thereafter, Mr. Tolson reinspected the Property and produced two more reports. Doc. 52-5, Pl.'s App. at 5-148 (Tolson Report dated Sept. 29, 2022); Doc. 52-6, Pl.'s Resp. App. at 6-163 (Tolson Report dated Sept. 30, 2022). Mr. Tolson found hail damage on the roof of Building 200, but, for the first time, he attributed these damages to a prior hailstorm in April 2017, rather than the June 2021 hailstorm. Doc. 52-5, Pl.'s Resp. App. at 7-12. Similarly, with Building 300, Mr. Tolson observed hail damage to the roof but attributed it to an April 2017 hailstorm, rather than the June 2021 hailstorm. Doc. 52-6, Pl.'s Resp. App. at 7-10.

### E. Defendant's Denial of the Reopened Claims

Relying on Mr. Tolson's reports, on or about October 4, 2022, Defendant denied coverage for the reopened 2021 Hail Claim, stating:

Our investigation indicates a larger hail event from 2017 caused damages to a few clay tiles and a few noted impact to the tar adhesive for the gravel aggregate. Additionally, the roof shows wear and tear and normal deterioration due to age and weathering. Interior damages are not as a result of the hail event from April 23, 2021[,] and are not included as part of the claim.

Doc. 52-6, Pl.'s Resp. App. at 119-120.[3]

On or about November 8, 2022, Defendant denied coverage for the reopened 2022 Wind and Water Claim, stating:

Our investigation indicates that on the date of loss, rain water entered the interior of Location 01 Building 01 635 W. Campbell Rd. (300), Richardson, TX[], from the roof causing damage to the interior. There was no wind damage to the roof or exterior walls that would allow the water to enter. Wear and tear of the roof and roofing sealant was observed on the roof and roof curbing.

For Building 02 635 W. Campbell Rd. (200) Richardson, TX[,] there appears to be no wind damage to the roofing or wind caused openings. The roofing shows signs or deterioration, and wear and tear.

Interior water damage is not covered under the policy unless the building first sustains damage by a Covered Cause of Loss to its roof or walls through which the water enters. Additionally, damage or loss caused by wear and tear, deterioration, and improper construction or design is excluded by your policy. Payment will not be forthcoming.

Doc. 41, Def.'s App. at 270.

### F.  This Litigation

On April 19, 2023, Plaintiff filed this civil action, and in the Amended Complaint, the live pleading, asserts claim for breach of contract[4]; violations of Chapter 541 of the Texas Insurance Code; violations of various provisions of the Texas Deceptive Trade Practices Act (DTPA), Tex.

---

[3] On October 4, 2022, Defendant issued a supplemental claim decision and a payment totaling $1408.19 to account for metal roof vents and other metal components identified as potentially damaged by the April 2021 hailstorm. Doc. 40-1, Def.'s App. at 7; Doc. 41, Def.'s App. at 256.

[4] Specifically, Plaintiff alleges breach of contract with regard to Defendant's denial of the reopened 2021 Hail Claim (pertaining to an April 2021 hailstorm that Plaintiff alleges damaged not just the HVAC units on the roof but the roof itself); and Defendant's denial of the reopened 2022 Wind and Water Claim (pertaining to a 2022 wind and rainstorm that Plaintiff alleges damaged the Property's roof and flooded certain tenant suites). *See generally* Doc. 5, Am. Compl. ¶¶ 22-27.

Bus. & Com. Code Ann. §§ 17.41-17.63; and breach of the common law duty of good faith and fair dealing. *See generally* Doc. 5, Am. Compl.

On June 17, 2024, Defendant filed its Motion for Summary Judgment as well as its Motion to Strike Jetton's opinion and testimony, upon which Plaintiff relies in opposing Defendant's Motion for Summary Judgment. Plaintiff, in turn, filed its Motion to Strike the anticipated trial testimony of Mr. Tolson and Defendant's designated expert David Teasdale. The motions have been fully briefed and are ripe for disposition.

## II.   Legal Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita*

**Memorandum Opinion and Order - Page 8**

*Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). Mere conclusory allegations are not competent summary judgment evidence and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

**Memorandum Opinion and Order - Page 9**

### III.   Defendant's Motion to Strike (Doc. 35)

Prior to analyzing Defendant's Motion for Summary Judgment, the court turns to its Motion to Strike Mr. Jetton's opinions and testimony. In support, Defendant contends that Mr. Jetton's opinions fail to comply with Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). *See* Doc. 36, Def.'s Br. in Supp. of Mot. to Strike 12-17. In addition, Defendant contends Mr. Jetton's designation and disclosure fail to comply with Fed. R. Civ. P. Rule 26(a)(2)(B). *See* Doc. 36, Def.'s Br. in Supp. of Mot. to Strike 17-21. The court turns first to Defendant's contention that Mr. Jetton's report is deficient under Rule 26(a)(2)(B).

### A.  Defendant's Rule 26(a)(2)(B) Challenge

Under Rule 26(a)(2)(B), the disclosures of an expert witness who is retained or specially employed to provide expert testimony in the case or whose duties as the party's employee regularly involve giving expert testimony must be accompanied by a written report containing:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of compensation to be paid for the study and testimony in the case.

Fed. R. Civ. 26(a)(2)(B). The Advisory Committee's Note to Rule 26 provides that expert witnesses "must prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefor." Rule 26 advisory committee's note (1993 amendments). "These Notes also explain that the purpose of the reports is to avoid the disclosure of 'sketchy and vague' expert information, as was the practice under the former rule." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996) (citing Rule 26 advisory committee's note (1993 amendments)).

In Plaintiff's Disclosure of Expert Witnesses, Plaintiff designated Mr. Jetton as a retained expert who may be called to testify regarding any of the matters set out in his report, including his "inspection of the damage" sustained at the Property; "the necessity and reasonability of the repairs performed at the Property"; and the deficiencies in the inspections performed by Mr. Tolson. Doc. 20, Pl.'s Disclosure of Expert Witnesses ¶ 1. Plaintiff's Disclosure also stated Mr. Jetton will rebut the opinions of Defendant's designated experts. *Id.* Mr. Jetton's nineteen-page initial report ("Initial Report") is attached as Exhibit 1 to Plaintiff's Disclosures. *See* Doc. 20-1, Ex. 1 to Pl.'s Disclosure of Expert Witnesses.

Defendant maintains that Mr. Jetton's Initial Report is deficient under Rule 26(a)(2)(B)(i)-(iii) because he "never name[s] a date of loss, despite his later attempts to do so in his deposition testimony"; he "conducted lab testing on roof samples taken from the [P]roperty… but fail[ed] to discuss this testing or how it informed his opinions"; and "there was simply never a clear disclosure of the weather reports Jetton reviewed." Doc. 36, Def.'s Br. in Supp. of Mot. to Strike 17-19. Upon review of Mr. Jetton's nineteen-page Initial Report and the over five hundred pages of attached materials upon which he relied in forming his opinions, *see* Doc. 20-1, Initial Report at 2-561, other than the possible omission of a few weather reports and a spreadsheet, which the court addresses below, the court determines that Mr. Jetton properly disclosed his opinions and the facts and data he considered in forming them, as required by Rule 26(a)(2)(B)(i) and (ii).

First, although Defendant criticizes the Initial Report for failure to specify an exact date of loss, the court finds the report sufficient in this regard. Mr. Jetton opines, consistent with his Pre-Litigation Inspection Report, *supra*, that damage to the Property resulted from "direct, physical damage consistent with hail stone strikes and elevated wind conditions . . . within the last year, including in June 2022 when [Plaintiff] reported its loss." Doc. 20-1, Pl.'s App. at 20 (Initial Report

**Memorandum Opinion and Order - Page 11**

at 19). Further, although the Initial Report and its attachments are sufficient on their own, Mr. Jetton expanded on his Pre-Litigation Inspection Report and his Initial Report in his extensive deposition included as part of the appendix to Plaintiff's response to Defendant's Motion for Summary Judgment.[5]

Second, Defendant asserts that Mr. Jetton's Initial Report is deficient because he "conducted lab testing on roof samples taken from the [P]roperty… but fail[ed] to discuss this testing or how it informed his opinions." Doc. 36, Def.'s Br. in Supp. of Mot. to Strike 19. Once again, the court disagrees. First, the laboratory results are attached in their entirety to the Initial Report. *See* Doc. 54-1, Pl.'s App. in Supp. of Resp. to Def.'s Mot. to Strike at 508-535 (Laboratory Report No. B22080663). Further, in his Pre-Litigation Investigation Report (which is attached to his Initial Report), Mr. Jetton notes, "Roof cores were taken of typical impact mark conditions and revealed that . . . the insulation board was raveling, consistent with water intrusion in all four of the cores taken on both the upper and lower roofs." *See* Doc. 54, Pl.'s App. in Supp. of Resp. to Def.'s Mot. to Strike App. at 14. He further states in his Initial Report:

> Water was found in the two roof cores taken on the upper roof. As a result, the underlying insulation was raveling, which is consistent with water intrusion. Such damage was present in all four of the roof cores taken on both the upper and lower roofs. Each roof core also indicated damage consistent with hail stone impacts: indentions in the surface of the BUR, splits on the underside of the BUR, fractures in the fiber mat material, and indentions in the underlying materials. The damage observed would allow water to pass through the BUR system and leak into the building envelope.

Doc. 54-1, Pl.'s App. in Supp. of Resp. to Def.'s Mot. to Strike at 11 (Initial Report at 7).

---

[5] Plaintiff has provided a Declaration from Mr. Jetton. *See* Doc. 54, Pl.'s App. in Supp. of Resp. to Def.'s Mot. to Strike at 5-7. Defendant objects to Mr. Jetton's Declaration. *See* Doc. 60, Def.'s Reply Brief in Supp. of Mot. to Strike 9. To the extent that Defendant maintains it was surprised by any new information in Mr. Jetton's Declaration (which came after his deposition), although not requested, the court will allow for a follow up deposition of Mr. Jetton *limited to any matters raised for the first time in his Declaration, if there are any*. Given the lack of any undue prejudice to Defendant, the court **overrules** its objection to Mr. Jetton's Declaration.

**Memorandum Opinion and Order - Page 12**

In his Initial Report, Mr. Jetton also comments on the photographs of the samples themselves and attaches the laboratory report, which explains "the request to photograph marked regions to document varying degrees of damage," and then shows the marked regions reflecting the damage. Doc. 54-1, Pl.'s App. in Supp. of Resp. to Def.'s Mot. to Strike at 508-535. These documents and statements are sufficient to explain how Mr. Jetton relied on the roof core samples. Moreover, this issue can be addressed further by a healthy and robust cross-examination.

Third, Defendant maintains that the Initial Report is deficient because "there was simply never a clear disclosure of the weather reports Jetton reviewed." Doc. 36, Def.'s Br. in Supp. of Mot. to Strike 19.[6] Although Defendant acknowledges that five weather reports were attached to the Initial Report, *see id.*, a review of Mr. Jetton's deposition transcript supports Defendant's contention that the Initial Report did not include all weather reports Mr. Jetton claimed to have reviewed in reaching his conclusions, and it does not appear that the spreadsheet that tracked those sources was produced. *See* Doc. 37-4, Def.'s App. in Supp. of Motion to Strike at 13 (Jetton Dep. Tr. 46:14–49:21); *id.* at 23 (Jetton Dep. Tr. 88:6-8).

If a party fails to provide information or identify a witness as required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Plaintiff contends:

> Even if Nationwide were correct that Jetton failed to adequately disclose his report (it is not), the harsh sanction of striking the entirety of Jetton's opinions and testimony is incongruent. There is no evidence of willful disobedience of a court

---

[6] Insofar as Defendant asserts that Plaintiff improperly asserted a privilege claim to its subpoena duces tecum served on Mr. Jetton, *see* Doc. 36, Def.'s Br. in Supp. of Mot. to Strike 20-21, the court is unable to discern which documents Defendant contends have been withheld. Further, the record does not show that Defendant filed a motion to compel or conferred with opposing counsel regarding production of these documents as required by Fed. R. Civ. P. 37(a)(1) and this District's Local Civil Rule 7.1 As the issue of any privilege claim has not been fully joined, the court declines to consider it in the context of resolving the pending motions.

**Memorandum Opinion and Order - Page 13**

> order or a complete failure to comply with Rule 26(a)(2)(b) and a lesser sanction, such as supplementing disclosures, would be a proportionate remedy to Nationwide's grievances.

Doc. 53, Pl.'s Resp. to Def.'s Mot. to Strike 25 note 7 (cleaned up) (citation omitted). In its reply, Defendant fails to address Plaintiff's argument. *See generally* Doc. 61, Def.'s Reply.

In evaluating whether a violation of Rule 26 is harmless, the court examines four factors: (1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose. *Texas A & M Research Fund v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003). The evidence contained in the Initial Report is clearly important to Plaintiff's case; it relies on Mr. Jetton's opinion testimony to establish storm damage to the Property during the policy periods. As for the second factor, Defendant has not adequately explained how the omission of some references caused it prejudice; its chief objection is that it "cannot determine the extent of the reviewed reports" without consulting Mr. Jetton's file "or attempting to ferret out that information as best it can during Jetton's deposition." Doc. 36, Def.'s Br. in Supp. of Mot. to Strike 19. The third factor suggests that any potential prejudice could be cured through a request for a continuance to conduct a second deposition; Defendant, however, did not ask for such a continuance or a supplemental deposition. As for the fourth factor, Plaintiff argues that the expert report is extensive, and Defendant concedes that five weather reports were available for examination. Doc. 53, Pl.'s Resp. to Def.'s Mot. to Strike 26. Thus, the first and third factors weigh heavily in favor of Plaintiff; the second factor only slightly favors Defendant; and the fourth factor only slightly favors Defendant. Considering these factors together, the court finds that any violation of Rule 26(a)(2)(B)(iii) was harmless and declines to limit the expert testimony as requested by Defendant. *Texas A & M Research Fund*, 338 F.3d at 402; Fed. R. Civ. P. 37(c)(1).

**Memorandum Opinion and Order - Page 14**

For these reasons, the court **denies** Defendant's Motion to Strike based on its contention that Mr. Jetton's Initial Report is deficient under Rule 26(a)(2)(B)(i)-(iii).

## B.  Defendant's Rule 702 Challenge

Defendant also moves to strike the opinions and testimony of Mr. Jetton on the grounds that his opinions are not relevant or reliable under Rule 702 or *Daubert*. *See* Doc. 36, Def.'s Mot. to Strike 12-17. In response, Plaintiff contends, among other things, that: (1) Mr. Jetton's "opinions are relevant and helpful to the jury in deciding what caused damage to [its] Property"; and (2) Defendant's "criticism of [his] methodology is nothing more than an observation that Jetton reaches a different conclusion than Tolson." Doc. 53, Pl.'s Resp. to Def.'s Mot. to Strike 18, 22.

### 1.  Requirements of Fed. R. Evid. 702

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702.[7] Congress amended Rule 702, effective December 1, 2023,[8] to read as follows:

Rule 702. Testimony of Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

---

[7] The admissibility of evidence is a procedural issue governed by federal law. *See Reed v. General Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985).

[8] The amendments "shall take effect on December 1, 2023, and shall govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending." Fed. R. Evid. Refs & Annos (2023).

**Memorandum Opinion and Order - Page 15**

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court instructed courts to serve as gatekeepers when applying Rule 702 to determine whether expert testimony should be presented to the jury. 509 U.S. at 589-95. Courts must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That "gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

Under the *Daubert* test, which examines the underlying theory on which an expert opinion is based, "[t]he proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The court's inquiry is flexible, in that "[t]he relevance and reliability of expert testimony turn[] upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Fed. R. Evid. 702(d) (requiring that the "expert's opinion reflects a reliable application of the principles and methods to the facts of the case.").

**Memorandum Opinion and Order - Page 16**

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Fed. R. Evid. 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight*, 482 F.3d at 355 (citation and internal quotation marks omitted). While "there is no requirement that an expert derive his [or her] opinion from firsthand knowledge or observation," *Deshotel v. Wal–Mart La., L.L.C.*, 850 F.3d 742, 746 (5th Cir. 2017) (internal quotation marks omitted), "[t]he reliability prong mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks omitted).

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623 (5th Cir. 2018) (quoting *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)). "The proponent need not prove to the judge that the expert's testimony is correct, but [it] must prove by a preponderance of the evidence that the testimony is reliable." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). On the other hand, if "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable, as "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

**Memorandum Opinion and Order - Page 17**

When conducting a reliability analysis, courts consider the following non-exclusive list of factors:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Johnson*, 685 F.3d at 459 (internal quotation marks omitted). These factors are not definitive or exhaustive. In conducting the *Daubert* analysis, courts have discretion in determining which factors are most germane in light of the nature of the issue, the particular expertise, and the subject of the expert's testimony. *Daubert*, 509 U.S. at 593-95; *Kumho Tire Co.*, 526 U.S. at 142.

In addition, the Advisory Committee's Notes to Rule 702 contemplate that expert testimony may be based on experience, training, or both:

> Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. *See, e.g., United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail); *Tassin v. Sears Roebuck*, 946 F. Supp. 1241, 1248 (M.D. La. 1996) (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches"). *See also Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1178 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Fed. R. Evid. 702 advisory committee's notes to 2000 amendments.

**Memorandum Opinion and Order - Page 18**

The Advisory Committee Notes[9] to the recently amended Rule 702 explain that Rule 702 was amended to: (1) "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule" and (2) "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

The 2023 advisory committee notes to Rule 702 observe that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The amendment is intended "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." *Id.* In other words, the proponent must first show by a preponderance of the evidence that the expert passes Rule 702 standards. *Id.* "[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." *Id.*

---

[9] "The Advisory Committee Notes are instructive on the drafters' intent in promulgating the federal rules." *United States v. Navarro*, 169 F.3d 228, 237 (5th Cir. 1999) (citing *Williamson v. United States*, 512 U.S. 594, 614-15(1994) (Kennedy, J., concurring) ("When as here the text of a Rule of Evidence does not answer a question that must be answered in order to apply the Rule, and when the Advisory Committee's Note does answer the question, our practice indicates that we should pay attention to the Advisory Committee's Note. We have referred often to those Notes in interpreting the Rules of Evidence, and I see no reason to jettison that well-established practice here.")); *see also* 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1029 (4th ed. 2023) ("In interpreting the federal rules [of civil procedure], the Advisory Committee Notes are a very important source of information and direction and should be given considerable weight. Although these Notes are not conclusive, they provide something akin to a 'legislative history' of the rules and carry, in addition, the great prestige that the individual members of the successive Advisory Committees, and the Committees themselves, have enjoyed as authorities on procedure.").

**Memorandum Opinion and Order - Page 19**

The 2023 advisory committee notes also recognize that:

> It will often occur that experts come to different conclusions based on contested sets of facts. Where that is so, the Rule 104(a) standard does not necessarily require exclusion of either side's experts. Rather, by deciding the disputed facts, the jury can decide which side's experts to credit. "[P]roponents 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.'" Advisory Committee Note to the 2000 amendment to Rule 702, quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994).

*Id.* (ellipses in original). Finally, the 2023 advisory committee notes emphasize that:

> Nothing in the amendment imposes any new, specific procedures. Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702. Similarly, nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The Rule 104(a) standard does not require perfection. On the other hand, it does not permit the expert to make claims that are unsupported by the expert's basis and methodology.

*Id.*

It remains the case that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (explaining that, "[a]lthough the *Daubert* analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does not judge the expert conclusions themselves"). Although "the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, 'the rejection of expert testimony is the exception rather than the rule.'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (quoting Fed. R. Evid. 702 advisory committee note to 2000 amendments).

**Memorandum Opinion and Order - Page 20**

### 2. *The Parties' Contentions*

Defendant challenges Mr. Jetton's opinions on two grounds. First, Defendant contends Mr. Jetton's testimony on causation is not helpful or relevant because he "has not determined whether the alleged damage occurred during the policy periods at issue in this case . . . but merely points to other reports mentioning storm dates and concludes that some of Plaintiff's claimed damage must have occurred during those policy periods." Doc. 36, Def.'s Mot. to Strike 12. According to Defendant, "[w]ith respect to when the claimed damage occurred, this lack of analysis provides nothing that the jury could use to evaluate whether identifiable covered damage occurred on the loss dates applicable to this lawsuit." Doc. 36, Def.'s Mot. to Strike 12. Second, Defendant argues Mr. Jetton's opinions are unreliable because he "failed to allocate damages between Plaintiff's claimed covered cause of loss—wind and hail during the policy period—and other non-covered causes of loss, such as large January 2017 and June 2019 storms with stronger winds than Plaintiff's claimed date of loss." Doc. 36, Def.'s Mot. to Strike 15-16.

Plaintiff responds that Mr. Jetton's causation testimony is relevant and helpful to the jury, even if he acknowledges that the Property may have had a few hail dings from past storms, and he used a reliable methodology to assess the timing of the damage to the Property, which he explained in detail in his deposition. *See* Doc. 53, Pl.'s Resp. to Def.'s Mot. to Strike 18-24.

Mr. Jetton inspected the Property for storm-related damage in August 2022 (prior to his Pre-Litigation Investigation Report) and again in September 2022 (prior to his Initial Report). *See* Doc. 52-1, Pl.'s Resp. App. at 7-8 (Initial Report at 2-3). He found damage consistent with hailstone strikes and high wind conditions and determined that the damage, respectively, was consistent with the reported dates of loss (that is, April 2021 for the hail damage and June 2022 for the wind-related damage). *See* Doc. 52-1, Pl.'s Resp. App. at 19, 24 (Initial Report at 14, 19).

**Memorandum Opinion and Order - Page 21**

He estimated that the reasonable cost to repair or replace the Property damaged by the storms within the policy periods, including replacement of the roofs, totaled $4,041.404.96. *See* Doc. 52-1, Pl.'s Resp. App. at 19 (Initial Report at 14).

### 3. *Discussion*

#### a. Relevance

First, the court finds that Mr. Jetton's opinion testimony on causation is sufficiently relevant and helpful to be admissible at trial. As noted above, Mr. Jetton opined that the April 2021 hailstorm and the June 2022 storm with high winds and rain damaged the roofs at Building 200 and Building 300, respectively, and that the damage from the two storms required roof replacement. Although he stated that he could not definitively rule out the possibility that some hail dings on the roofs may have been caused by other hail events, this does not change his conclusion: the hail and wind/water storms of April 23, 2021, and June 1, 2022, respectively, caused the damage to the Property during the policy periods and that roof replacement was required. The court is not persuaded by Defendant's primary contention that Mr. Jetton's failure to *definitively* rule out other storms renders his opinions irrelevant and inadmissible. As another court in this District stated when denying a similar *Daubert* challenge in an insurance coverage dispute, "[w]hile failing to eliminate other possible causes may diminish the strength of an expert's opinion, the admissibility of that opinion is not affected." *Arlington S. Hills, LLC v. American Ins. Co.*, 51 F. Supp. 3d 681, 690 (N.D. Tex. 2014) (O'Connor, J.) (citation omitted); *see also Kim v. Nationwide Mut. Ins. Co.*, 614 F. Supp. 3d 475, 487 (N.D. Tex. 2022) (Fitzwater, J.) ("If [plaintiff's expert in an insurance coverage dispute] cannot rule out other storms [as the cause of hail damage to the insured's roof], this deficiency may diminish the credibility of his determination that the April 19 storm caused the damage, but it does not eliminate the testimony's relevance.").

This evidence is relevant and helpful because it would "assist the trier of fact to understand or determine a fact in issue"—namely, whether the April 2021 hailstorm and the June 2022 storm with high winds and rain caused the damage to the roofs at the Property within the policy periods. *See Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). This is not a circumstance in which the court must conclude that "there is simply too great an analytical gap between the data and the opinion proffered," such that the court may exclude the testimony as irrelevant or unhelpful.[10] *Johnson*, 685 F.3d at 461 (quoting *Joiner*, 522 U.S. at 146).

> b. Reliability

The court also determines that Mr. Jetton's opinion testimony on causation relied on proper methods. Mr. Jetton explained his methodology such that the court can conclude that it is sufficiently reliable. Mr. Jetton, a Senior Consultant at Ranger Technical Service with thirty-five years of experience with roof inspections—including inspecting for property damage and laboratory testing of construction materials for damage—testified at his deposition that he has "evaluated, to be conservative, . . . hundreds of hailstorms." *See* Doc. 54-2, Pl.'s App. in Supp. of Resp. to Def.'s Mot. to Strike at 32 (Jetton Dep. Tr. 106:22-23). In formulating his opinions in this action, in addition to relying on his experience, he conducted multiple physical inspections of the Property; reviewed photographs taken by Defendant's vendors, including Tolson Engineering Services, HVACi, and Haag Engineering; took samples from both roofs and sent them to a laboratory for analysis; reviewed historical images on Google Street View; and reviewed the same historical weather data that Defendant's experts included with their reports. *See* Doc. 54-1, Pl.'s

---

[10] Of note, Mr. Jetton's testimony is not that dissimilar to that of Defendant's expert, Mr. Teasdale, who agrees that physical evidence demonstrates that hail had fallen within a year prior to September of 2022 (within the policy periods). *See* Doc. 54-5, Pl.'s App. in Resp. to Def.'s Mot. to Strike (Teasdale Dep. Tr. 77:1–77:22). Further, HVACi's 2021 inspection and Nationwide's initial payout on the 2021 Hail Claim demonstrate that the April 23, 2021 hail storm caused damage to the Property. *See* Doc. 40-1, Def.'s App. at 3-4, 207, 222-224. The dispute hinges on how much damage occurred based on that hail event.

App. in Supp. of Resp. to Def.'s Mot. to Strike at 6 (Initial Report at 2). He explained at length during his deposition how the evidence and data in his reports support his causation and timing opinions. When asked, "What makes the probability high that [the damage] occurred between June 2021 and June of [20]22," he answered, "Because we have the dated damaged materials." *See* Doc. 54-2, Pl.'s App. in Supp. of Resp. to Def.'s Mot. to Strike at 48 (Jetton Dep. Tr. 172:17-22). Mr. Jetton explained he utilized "every item that we could think of at the time to develop a timeframe. Like dates of materials that have a date that they were installed after 2019 or 2020 had hail dings on them. That tells me it had to happen after that." *See* Doc. 54-2, Pl.'s App. in Supp. of Resp. to Def.'s Mot. to Strike at 29 (Jetton Dep. Tr. 94:19–95:2). Upon further questioning, he stated, "So we identified items related to materials that have actual manufacturing dates on them and some of those were installed [in 2021 but prior to April 2021] and had hail damage on them. *See* Doc. 54-2, Pl.'s App. in Supp. of Resp. to Def.'s Mot. to Strike at 66 (Jetton Dep. Tr. 244:3-14). He also reviewed "Google Street Views that show displaced shingles" that did not "exist prior to one day and it existed before the next day that they took photographs. So that's how we dated it." *See* Doc. 54-2, Pl.'s App. in Supp. of Resp. to Def.'s Mot. to Strike at 29 (Jetton Dep. Tr. 95:2-8).

Although Defendant suggests there are other possible causes of the hail damage identified by Mr. Jetton, having reviewed the evidence, the court is satisfied with Mr. Jetton's showing of reliability in this instance. *See, e.g.*, *Wings Platinum, LLC v. Westchester Surplus Lines Ins. Co.*, 2025 WL 391388, at *3-4 (N.D. Tex. Feb. 4, 2025) (Fitzwater, J.) (finding an expert's opinions about hail damage to roof reliable when expert reached his opinion based on his "inspection of the entire roof, review of historical information about the property, weather data, and materials provided by [Owner]."); *TBC-JP-LR, JV v. Allied Prop. & Cas. Ins. Co.*, 2018 WL 10562785, at *4 (N.D. Tex. Sept. 28, 2018) (Means, J.) (finding an expert's opinions about the age and cause of

**Memorandum Opinion and Order - Page 24**

storm damage reliable when based on a review of storm events, damage, and experience working in the area and noting that the expert "need not eliminate all possible causes of the damage at issue, however, for his opinion to be sufficiently reliable to be presented to the jury"); *Kahlig Auto Grp. v. Affiliated FM Ins. Co.*, 2021 WL 148056, at *4 (W.D. Tex. Jan. 15, 2021) (finding expert testimony reliable when the expert "reviewed an analysis of published weather data from the date of the storm; physically inspected the three dealerships; interviewed employees with personal knowledge of the storm and damage; [and] reviewed photographs of vehicles located at the three dealerships damaged by hail during the storm[.]").

*To be clear, in keeping with the 2023 amendments to Rule 702, supra, the court finds that Plaintiff has met its burden to demonstrate that it is more likely than not that Mr. Jetton's opinions concerning roof damage and causation meet the admissibility requirements set forth in Rule 702 and conform to the bounds of what can be concluded from a reliable application of his basis and methodology.* Yet having made this determination, the court is not suggesting that Mr. Jetton's assumptions and analysis are immune from inquiry related to the criticisms lodged by Defendant. Nothing about the 2023 amendments to Rule 702, as previously examined, changes the importance of effective and vigorous cross-examination by seasoned trial counsel as an appropriate remedy for many of Defendant's objections. Accordingly, the court **denies** Defendant's Motion to Strike.

## IV.    Defendant's Motion for Summary Judgment

### A. Plaintiff's Breach of Contract Claim

Defendant moves for summary judgment on Plaintiff's breach of contract claim solely on the grounds that Plaintiff has "failed to segregate damage attributable solely to a covered cause of loss." Doc. 39, Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Summ. J. Br.") 23. Defendant relies upon the concurrent causation doctrine to form the basis of this argument for summary

judgment. *See id.* at 23-24. In response, Plaintiff contends the concurrent causation doctrine does not apply because it has provided sufficient evidence that the covered storms are the sole cause of the claimed loss requiring roof replacement. Doc. 51, Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Summ. J. Resp. Br.") 6. As explained below, Plaintiff has met its burden at this summary judgment stage.

### 1.   The Concurrent Causation Doctrine and Sole Causation Evidence

Under Texas's concurrent causation doctrine, "when covered and non-covered perils combine to create a loss, the insured is entitled to recover that portion of the damage caused solely by the covered peril." *Advanced Indicator and Manufacturing, Inc. v. Acadia Ins. Co.*, 50 F.4th 469, 477 (5th Cir. 2022) (per curiam) (citation and internal quotation marks omitted). "Because an insured can recover only for covered events, the burden of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof." *Id.* (citation and internal quotation marks omitted).

To satisfy the concurrent-causation doctrine, "[a]n insured may carry its burden by putting forth evidence demonstrating that the loss came solely from a covered cause or by putting forth evidence by which a jury may reasonably segregate covered and non-covered losses." *Id.* (citing *Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 162 (Tex. 1971)). Expert allocation of damages between covered and excluded risks is not necessarily required; "circumstantial evidence can suffice." *Lyons v. Miller Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 601 (Tex. 1993) (finding that testimony of insured and her neighbors that there was no preexisting damage to the staircase or brick veneer constituted some evidence of the extent of damage attributable solely to the windstorm rather than to settling foundation, an excluded peril under which insurer denied coverage).

"There are substantial gaps" in the doctrine of concurrent causation, and the Fifth Circuit has made multiple attempts to certify questions involving the doctrine to the Supreme Court of Texas. *Overstreet v. Allstate Vehicle and Prop. Ins. Co.*, 34 F.4th 496, 497 (5th Cir. 2022), *certified question accepted* May 27, 2022, *certified question dismissed* Sept. 16, 2022; *see also Frymire Home Servs., Inc. v. Ohio Sec. Ins. Co.*, 12 F.4th 467 (5th Cir. 2021), *certified question accepted* Sept. 10, 2021, *certified question dismissed* Dec. 3, 2021; *see also Advanced Indicator*, 50 F.4th at 476 n.4 (noting that *Overstreet* and *Frymire* both settled after certification, so the court's questions regarding when the concurrent doctrine applies and the plaintiff's burden of proof under it remain unanswered).

One of the certified questions in both *Overstreet* and *Frymire* was, broadly, "whether the presence of any pre-existing damage triggers the concurrent causation doctrine." *Overstreet*, 34 F.4th at 498; *see Frymire*, 12 F.4th at 471. Both cases involved roofs with pre-existing wear-and-tear damage that were later damaged by a storm. *See Overstreet*, 34 F.4th at 498; *see Frymire*, 12 F.4th at 471. Both panels said that Texas law did not clearly answer whether the concurrent causation doctrine applies in this situation and, if so, what it requires. *See Overstreet*, 34 F.4th at 498; *see Frymire*, 12 F.4th at 471.

Despite these questions, which remain unresolved, the Fifth Circuit held in *Advanced Indicator* that the concurrent causation doctrine does not preclude recovery when the insured puts forth evidence "demonstrating that [its] loss came solely from a covered cause." *Advanced Indicator*, 50 F.4th at 477. Otherwise stated, if "a jury could reasonably find that all of [an insured's] loss comes from a covered cause, the concurrent-causation doctrine does not bar recovery." *Id.* In reaching its conclusion that the insured had presented sufficient summary judgment evidence demonstrating that the damage was caused by the relevant storm, the Fifth

Circuit cited testimony of a public adjuster "who stated that the roofing system 'completely failed,' and that the damage was 'absolutely' caused only by the hurricane." *Id.* at 476. The insured's expert engineer "also testified at his deposition that the damage was caused by" the storm, and the summary judgment "record contain[ed] previous reports demonstrating that the building was in good shape." *Id.* Based on the foregoing, the Fifth Circuit concluded the insured's breach of contract claim was not barred. *Id.* at 477.

### 2. Discussion

Defendant argues that Plaintiff cannot produce evidence segregating non-covered losses from its claimed damages or, alternatively, cannot demonstrate that its claimed damages are attributable solely to a covered peril. On this basis, Defendant argues it is entitled to summary judgment. Plaintiff counters that it has produced sufficient summary judgment evidence that its claimed damages arose solely from the April 2021 hailstorm and the June 2022 storm with high winds and rain.

Here, Plaintiff has satisfied its burden to show that a genuine dispute of material fact exists as to whether the claimed roof damages were caused solely by the April 2021 hailstorm and the June 2022 storm. *See Hub Tex., LLC v. Arch Specialty Ins. Co.*, 2023 WL 11859631, at *10 (N.D. Tex. Mar. 21, 2023) ("Application of the doctrine in this case initially hinges on whether Hub has submitted sufficient summary judgment evidence showing 100% of the claimed damage to the Property was caused by the March and/or May 2020 storms."). First, Plaintiff produces testimony from its expert, Mr. Jetton. He conducted a thorough analysis and concluded that the hail and wind/water damage he observed was consistent with the reported dates of loss (April 2021 and June 2022); that the majority of the damage can be dated to the time period of up to a year and a half before June 2022; that the damage from this time period will require total replacement of the

roofs at Building 200 and Building 300; and that the hail damage and wind/water damage he observed each independently and separately caused the need for roof replacement. *See* Doc. 52, Pl.'s Resp. App. at 7-18 (Jetton Dep. Tr.); Doc. 52-1, Pl.'s Resp. App. at 6-24 (Initial Report); Doc. 52-4, Pl.'s Resp. App. at 213-220 (Pre-Litigation Investigation Report); Doc. 52-7, Pl.'s Resp. App. at 164 (Jetton Decl. ¶ 13). Mr. Jetton reached these conclusion after conducting multiple physical inspections of the Property; reviewing photographs taken by Defendant's vendors, including Tolson Engineering Services, HVACi, and Haag Engineering; taking samples from both roofs and sending them to a laboratory for analysis; reviewing historical images on Google Street View; and reviewing the same historical weather data that Defendant's experts included with their reports. *See* Doc. 52-1, Pl.'s Resp. App. at 7 (Initial Report at 2); Doc. 52-7, Pl.'s Resp. App. at 162-163 (Jetton Decl. ¶ 4).

In addition, Plaintiff provides evidence from the date Ms. Underwood took over management of the Property (at the end of 2018), that "[a]ny time a leak was reported, the roofers came out." Doc. 52, Pl.'s Resp. App. at 33 (Underwood Dep. Tr. 57:13-19). Invoices reflect that the instances of roofer work necessitated by leaking had decreased year by year after she assumed ownership: there were four leak repairs needed in 2019; three in 2020; one in 2021; and one in the first half of 2022. *See* Doc. 52-4, Pl.'s Resp. App. at 16-26 (2019 invoices); *id.* at 28-33 (2020 invoices); *id.* at 35-36 (2021 invoice); *id.* at 37- 43 (2022 invoice). After the June 2, 2022 storm, however, the Property required six leak repairs in the second half of 2022, and eight more in 2023. *See* Doc. 52-7, Pl.'s Resp. App. at 144-160 (2023 invoices).

Defendant's own pre-incident inspections show that as of 2009, the roof had "no signs of age." *See* Doc. 52-4, Pl.'s Resp. App. at 49 (Loss Control Survey). As recently as December 2021, Defendant's underwriting and risk assessment unit wrote: "Building condition above average for

**Memorandum Opinion and Order - Page 29**

age." *See* Doc. 52, Pl.'s Resp. App. at 27 (12/15/2021 Commercial Property Individual Risk Premium Modification Documentation).

Viewing the foregoing evidence in a light most favorable to Plaintiff, a reasonable juror could conclude that the April 23, 2021 hail storm and the June 1, 2022 storm with high winds and rain solely caused the damage to the Property requiring full roof replacement. *See, e.g., Advanced Indicator*, 50 F.4th at 477 (holding that when insured's summary judgment evidence, including insured's experts' testimony, demonstrated "hurricane was the sole cause of [insured's] loss," "the concurrent causation doctrine [did] not bar recovery").[11]

As in *Advanced Indicator*, Defendant "offers evidence to the contrary." 50 F. 4th at 476. In addition to evidence of wear and tear,[12] it provides a SeekNow report showing no wind or hail damage to the roof at Building 300 and attributing the interior damage to a roof leak resulting from clogged drains. *See* Doc. 40-1, Def.'s App. at 5, 313-315. Defendant also provides reports from Mr. Tolson. After Mr. Tolson evaluated the roof and interior leaks, he concluded there was no wind damage to the roof following the June 2022 storm and that water entered through the sealant defects at the screen wall pitch pans and through the longitudinal cracks at the curb flashing. *See* Doc. 40-1, Def.'s App. at 6, 392. Mr. Tolson, after further inspecting the Property, found hail damage on the roof of Building 200, but, for the first time, he attributed these damages to a prior

---

[11] Of note, the district court in *Advanced Indicator* granted summary judgment in favor of the insurer in part because the insured's expert engineer did "not differentiate losses caused by [the hurricane] from preexisting losses." *Advanced Indicator & Mfg., Inc. v. Acadia Ins. Co.*, 2021 WL 199617, at *4 (S.D. Tex. Jan. 19, 2021). The lower court also found that the expert's deposition testimony conflicted with his declaration: the expert testified "that his report addresse[d] damage caused by or exacerbated by [the hurricane], but in his declaration he [stated] that the damage was caused solely by" the hurricane. *Id.* Despite this evidence and conclusion, the Fifth Circuit reversed, explaining that based on other evidence, "a jury could reasonably find that all of [the insured's] loss [came] from a covered cause"—that is, there was a fact issue concerning the cause of the damage. *Advanced Indicator*, 50 F.4th at 477.

[12] While Plaintiff may concede that some pre-existing damage is present, this does not alter the sufficiency of Plaintiff's evidence at the summary-judgment stage that two storms during the policy periods caused the damage that resulted in the need for full replacement of Plaintiff's roofing.

hailstorm in April 2017, rather than the June 2021 hailstorm. *See* Doc. 52-5, Pl.'s Resp. App. at 7-12. Similarly, with Building 300, Mr. Tolson observed hail damage to the roof but attributed it to an April 2017 hailstorm, not the June 2021 hailstorm. *See* Doc. 52-6, Pl.'s Resp. App. at 7-10.

Even accepting Defendant's evidence, the competing evidence, when viewed in the light most favorable to Plaintiff, creates a genuine dispute of material fact issue for the jury to resolve and does not entitle Defendant to summary judgment under the concurrent causation doctrine. *See Advanced Indicator*, 50 F.4th at 477. This result is in keeping with that reached by other district courts in the Fifth Circuit confronted with similar issues following the Fifth Circuit's decision in *Advanced Indicator*. *See, e.g., Winterfield United Methodist Church v. Church Mut. Ins. Co., S.I.*, 2024 WL 5356135, at *5 (E.D. Tex. Dec. 17, 2024) (recommending the district judge deny summary judgment when insured presented sufficient evidence to raise a genuine dispute of material fact that claimed damage was caused solely by a covered event, even though Defendant submitted competing evidence), *accepted by* 2025 WL 63670 (E.D. Tex. Jan. 9, 2025); *Marshall Mall Invs. LP v. Allied Prop. & Cas. Ins. Co.*, 2023 WL 5682412, at *3 (E.D. Tex. July 5, 2023) (same); *see also Bible Baptist Church v. Church Mut. Ins. Co.*, 2023 WL 1931912, at *7 (N.D. Tex. Jan. 18, 2023) (Reno, J.) (recommending the district judge deny summary judgment, where insured presented some evidence indicating the damage was caused solely by a covered event), *accepted by* 2023 WL 1931350 (N.D. Tex. Feb. 10, 2023) (Kacsmaryk, J.); *Anthon Minor, Ltd. v. State Auto. Mut. Ins. Co.*, 2023 WL 352935, at *7 (W.D. Tex. Jan. 20, 2023) (concluding that based on insured's summary judgment evidence, including one expert's opinion that roof needed to be replaced solely due to covered hail storm and another expert's declaration that he disregarded any pre-existing damage in determining causation, a jury could determine the covered storm caused the damage and that it could apportion any damages); *Labourdette v. State Farm Lloyds*,

**Memorandum Opinion and Order - Page 31**

2021 WL 2042974, at *5 (S.D. Tex. May 21, 2021) (denying summary judgment and explaining that where evidence showed a genuine dispute over whether damage was solely caused by covered storm or noncovered wear and tear, jury would not need to guess concerning percentage of damage but would instead have to determine credibility of competing experts); *cf. Certain Underwriters at Lloyd's of London v. Lowen Valley View, L.L.C.*, 892 F.3d 167, 171-172 (5th Cir. 2018) (affirming summary judgment in favor of insurer, where insured's evidence did not establish damage was caused solely by storm inside coverage period); *Shree Rama, LLC v. Mt. Hawley Ins. Co.*, 2023 WL 375358, at *2 (S.D. Tex. Jan. 24, 2023) (overruling insured's objection that magistrate judge erred by not discussing *Advanced Indictor*, reasoning that "unlike the facts in *Advanced*, nothing in the record suggeste[d] that [storm] . . . was the sole cause of the loss").

In summary, the court concludes that Plaintiff has raised a genuine dispute of material fact as to whether the April 2021 and June 2022 storms were the sole cause of its claimed damages. Thus, Defendant's argument that Plaintiff has failed to meet its burden of segregation need not be reached at this juncture. *See Adv. Indicator*, 50 F.4th at 476. Accordingly, the court **denies** Defendant's Motion for Summary Judgment with respect to Plaintiff's breach of contract claim.

## B. Plaintiff's Extracontractual Claims

Defendant also seeks summary judgment on Plaintiff's extracontractual claims for breach of the common law duty of good faith and fair dealing, violations of Texas Insurance Code Chapter 541, and the Texas DTPA.

First, Defendant argues that the failure of Plaintiff's breach of contract claim requires summary judgment dismissal of Plaintiff's extracontractual claims. Doc. 39, Def.'s Summ. J. Br. 31-32. Because the court has determined that Plaintiff's breach of contract claim survives summary judgment, Defendant's Motion for Summary Judgment on this basis is **denied**.

**Memorandum Opinion and Order - Page 32**

Second, Defendant argues that the summary judgment evidence shows nothing more than a bona fide dispute as to the presence of covered damages and therefore no extracontractual claims are available under Texas law. Doc. 39, Def.'s Summ. J. Br. 32-38. In opposition, Plaintiff argues that the summary judgment evidence supports more than a bona fide dispute. Doc. 52, Pl.'s Summ. J. Resp. 35-36.

Under Texas law, "[a]n insurer has a duty to deal fairly and in good faith with its insured in the processing and payment of claims." *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 340 (Tex. 1995); *see also Medical Care Am., Inc. v. National Union Fire Ins. Co.*, 341 F.3d 415, 425 (5th Cir. 2003). "A breach of the duty of good faith and fair dealing is established when: (1) there is an absence of a reasonable basis for denying or delaying payment of benefits under the policy and (2) the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payment of the claim." *Casey v. State Farm Lloyds*, 2022 WL 3702024, at *5 (N.D. Tex. Aug. 26, 2022) (Lindsay, J.) (citation omitted); *see also Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 55-56 (Tex. 1997) ("An insurer breaches its duty of good faith and fair dealing when the insurer had no reasonable basis for denying or delaying payment of [a] claim, and the [insurer] knew or should have known that fact.") (internal quotations omitted).

Whether an insurer's liability has become reasonably clear is a question of fact. *See Giles*, 950 S.W.2d at 56 ("[W]e reject the suggestion that whether an insurer's liability has become reasonably clear presents a question of law for the court rather than a fact issue for the jury."). On the other hand, "[e]vidence establishing only a bona fide coverage dispute does not demonstrate bad faith." *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998); *see also State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997) (evidence that shows a "bona fide coverage dispute does not, standing alone, demonstrate bad faith."). Stated another way, "an

**Memorandum Opinion and Order - Page 33**

insurer will not be faced with a tort suit for challenging a claim of coverage if there was any reasonable basis for denial of that coverage." *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997).

Texas courts have ruled that these extracontractual tort claims require the same predicate for recovery as bad faith causes of action in Texas. *See Hall Arts Ctr. Office, LLC v. Hanover Ins. Co.*, 327 F. Supp. 3d 979, 999 (N.D. Tex. 2018) (Fitzwater, J.) (citing Texas law); *see also Casey*, 2022 WL 3702024, at *5 (quoting *National Sec. Fire & Cas. Co. v. Hurst*, 2017 WL 2258243, at *6 (Tex. App.—Houston [14th Dist.] May 23, 2017)) ("extra-contractual tort claims pursuant to the Insurance Code [ ] require the same predicate for recovery as a bad faith claim under a good faith and fair dealing violation."). "When an insured joins claims under the Texas Insurance Code with a bad faith claim, all asserting a wrongful denial of policy benefits, if there is no merit to the bad faith claim, there can be no liability on either statutory claim." *Id.* (quoting *O'Quinn v. General Star Indem. Co.*, 2014 WL 3974315, at *8 (E.D. Tex. Aug. 5, 2014)). The court, therefore, examines Plaintiff's extracontractual claims for violation of Chapter 541 of the Texas Insurance Code, DTPA, and breach of the common law duty of good faith and fair dealing simultaneously.

Plaintiff has pointed to evidence in the record that Defendant and its vendor HVACi had photographs in 2021 showing hail damage to parts of the roof other than the HVAC units but never alerted the insured. Doc. 52-1, Pl.'s Resp. App. at 21 (Initial Report at 18) (noting that Defendant's vendor "HAVCi failed to report [in 2021] the readily visible storm related damage to other building components on the roof surface," and pointing with blue arrows on HVACi photos hail damage photographed but not reported by Defendant). Plaintiff also provides evidence that Mr. Kaapro failed to provide full information and follow industry standards in persuading Plaintiff to close its 2022 Wind and Water Claim by telling Ms. Underwood in a June 8, 2022 telephone conversation

**Memorandum Opinion and Order - Page 34**

that her roof could last up to 100 years, did not need replacement, suffered only minor damage, at a cost below the deductible, all without ever inspecting the roof, *see* Doc. 52, Pl.'s Resp. App. at 34 (Underwood Dep. Tr. 70:15–71:8; 71:12-22; ,72:17-19), and evidence that Mr. Kaapro did not log this particular call in his activity log, despite logging calls every other day and despite Nationwide's Best Claims Practices requiring "All relevant communications throughout the life of the claim will be documented into the claim file." Doc. 52-4, Pl.'s Resp. App. at 127-128 (Best Claims Practices). In addition, Plaintiff has provided evidence that beyond retaining the HVACi vendor to review HVAC units, Defendant did not inspect any other roof components in 2021, despite Ms. Underwood's questions to Mr. Oxenberg about whether there might be additional hail damage. *See* Doc. 52, Pl.'s Resp. App. at 35 (Underwood Dep. Tr. 143:1-6) (Ms. Underwood asking Nationwide, "how [could] there be damage to the HVAC units and not the roof"?); *id.* (Underwood Dep. Tr. 145:21-25) (Ms. Underwood expecting Nationwide to alert her of additional roof damage). Plaintiff has also provided evidence that conducting such an inspection is standard for at least some Nationwide adjusters. *See* Doc. 52, Pl.'s Resp. App. at 37 (Bott Dep. Tr. 19:12–20:9).

Based on this evidence and other evidence in Plaintiff's appendix, the court **denies** Defendant's Motion for Summary Judgment on Plaintiff's claims for violations of Chapter 541 of the Texas Insurance Code and the DTPA, as well as for breach of the duty of good faith and fair dealing.

### C. Plaintiff's Request for Attorney's Fees

Defendant also seeks summary judgment as to Plaintiff's claims for attorney's fees under the Texas Civil Practices & Remedies Code, the Texas Insurance Code, and the Texas DTPA. *See* Doc. 39, Def.'s Summ. J. Br. 38-39. In support, Defendant argues that Plaintiff's claims for

**Memorandum Opinion and Order - Page 35**

attorney's fees fail because all of its causes of action fail. *See id.* Here, because Plaintiff's breach of contract and extracontractual claims survive summary judgment, *see supra*, summary judgment is precluded as to Plaintiff's claim for attorney's fees. Therefore, the court **denies** Defendant's Motion for Summary Judgment as to Plaintiff's claim for attorney's fees.

**V.      Plaintiff's Motion to Exclude Expert Testimony and Brief in Support (Doc. 49)**

Plaintiff moves to "exclude portions of anticipated expert testimony by Defendant's experts David Teasdale and Owen Tolson." Doc. 42, Pl.'s Mot. to Exclude 5. Plaintiff's Motion to Exclude relates solely to anticipated trial testimony by Messrs. Teasdale and Tolson and, thus, is not germane to the court's analysis of Defendant's Motion for Summary Judgment. The court, therefore, in the exercise of its discretion, declines to entertain the motion at this juncture. Instead, to preserve scarce judicial resources and allow the parties an opportunity to mediate or settle their dispute without further court involvement, *see infra*, the court **denies** Plaintiff's Motion to Exclude Expert Testimony **without prejudice** to Plaintiff refiling the Motion should this matter proceed to trial.

**VI.      Conclusion**

For the reasons explained, the court **denies** Defendant's Motion to Strike the Opinions and Testimony of Plaintiff's Retained Testifying Expert Scott Jetton (Doc. 35); **denies** Defendant's Motion for Summary Judgment (Doc. 38); and **denies without prejudice** Plaintiff's Motion to Exclude Expert Testimony (Doc. 42). Unless resolved, all of Plaintiff's claims remain for trial.

As a final note, in light of the court's rulings herein, the time the case has been pending, and the time it will take to try if not resolved short of trial, the court strongly encourages the parties to consider resolution of the remaining claims. With respect to all of Plaintiff's claims, this is not an "open-and-shut" case for either party. This action is fact-intensive and involves the credibility

**Memorandum Opinion and Order - Page 36**

of witnesses. The court is not clairvoyant and has no idea how a jury would rule on the issues presented. In the meantime, however, through trial and possible appeal, the parties will continue to incur handsome legal fees. It behooves the parties, as the outcome of the claims is uncertain, to vigorously seek resolution of this action without further court involvement, except as stated below. In that vein, to eliminate the expenses of mediation, the court will make available a magistrate judge to conduct a settlement conference or mediation if the parties agree. If, after serious discussion (and potentially after mediation or a settlement conference), the parties cannot resolve their differences, the court will set this matter for trial. The court **directs** the parties to inform it in writing no later than **March 26, 2026**, whether they are able to resolve Plaintiff's claims in this action without further court involvement or desire to participate in a settlement conference or mediation with a magistrate judge at no cost. Moreover, as criminal trials take precedence over civil actions, and given the extraordinary busyness of the court's docket, it is likely this case cannot be tried until late Fall of 2026. The court will reset the trial of this case and pretrial deadlines by separate order, as necessary, once it hears from the parties.

   **It is so ordered** this 19th day of March, 2026.


Sam A. Lindsay
United States District Judge

**Memorandum Opinion and Order - Page 37**